# UNITED STATES DISTRICT COURT

for the
Eastern District of Missouri

| | |
|---|---|
| In the Matter of the Search of Precision Location Information; Subscriber & Transactional Records; Cell Site Information; Pen Register & Trap-and-Trace for Phone **(314) 930-9624** ) | Case No. 4:24 MJ 2087 JSD<br>*Signed and Submitted to the Court for filing by reliable electronic means*<br>**FILED UNDER SEAL**. |

## APPLICATION FOR A SEARCH WARRANT

I, Jessica L. Davis, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

**See Attachment A**

located in the Southern District of Florida, there is now concealed

**See Attachment B**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ✓ evidence of a crime;
- ✓ contraband, fruits of crime, or other items illegally possessed;
- ✓ property designed for use, intended for use, or used in committing a crime;
- ❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, USC Section 841 and 846 | possession with the intent to distribute controlled substances and conspiracy |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

✓ Continued on the attached sheet.
❑ Delayed notice of _____ days (give exact ending date if more than 30 days: _______) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

I state under penalty of perjury that the forgoing is true and correct

*Applicant's signature*
Jessica L. Davis, TFO, DEA

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedures 4.1 and 41.

Date: March 6, 2024

*Judge's signature*

City and State: St. Louis, MO

Honorable Joseph S. Dueker, U.S. Magistrate Judge
*Printed name and title*

AUSA: Jerome McDonald

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF AN APPLICATION OF THE UNITED STATES OF AMERICA FOR A WARRANT TO OBTAIN LOCATION INFORMATION, INCLUDING PRECISION LOCATION INFORMATION; SUBSCRIBER AND TRANSACTIONAL RECORDS; CELL SITE INFORMATION; AND FOR A PEN REGISTER AND TRAP AND TRACE DEVICES FOR PHONE NUMBER **(314) 930-9624** | ) | Case No. 4:24 MJ 2087 JSD<br>*Signed and Submitted to the Court for filing by reliable electronic means*<br>**FILED UNDER SEAL** |

## AFFIDAVIT

I, Jessica L. Davis, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a warrant and order pursuant to Rule 41 and 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) for information associated with a cellular telephone **(314) 930-9624** (hereinafter referred to as the "**subject cellular telephone")** to require **AT&T** (hereinafter "the Provider"), and/or any service providers reflected in Attachment A, to include providers of any type of wire and/or electronic communications, and any other applicable service providers, to disclose to the United States location information, including precision location information, transactional and subscriber data and cell site location information, and the installation and use of other pen register and trap and trace devices associated with the **subject cellular telephone,** as described in Attachment B to the requested warrant and order.

2. I am a Task Force Officer (TFO) with the United States Drug Enforcement Administration (DEA). I have been a Task Force Officer since May of 2021. I am currently assigned to the St. Louis Division, and I am a sworn police officer with over 14 years of law

enforcement experience, having served with the Florissant Police Department, and most currently the Wentzville Police Department, detached as a Narcotics Detective with the St. Charles County Regional Drug Task Force. During my tenure with DEA and as a Task Force Officer, I have previously been assigned to an investigative team responsible for numerous complex investigations of drug-trafficking organizations distributing fentanyl, heroin, cocaine, marijuana, and other controlled substances. These investigations have resulted in the seizure of fentanyl, heroin, methamphetamine, cocaine, and other controlled substances, and weapons. I am familiar with and have utilized normal methods of investigation, including, but not limited to, visual surveillance, questioning of witnesses, the use of search and arrest warrants, the use of informants, the use of pen registers, the utilization of confidential sources, and the use of court-authorized wire intercepts. My training with the DEA and as a sworn police officer has included specific training directly related to the aforementioned investigative techniques. I am an investigative and law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and as such, I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516, Title 18, United States Code.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. The present affidavit is being submitted in connection with an application of the United States for a warrant and order authorizing agents/officers of the investigative agency(ies), and other authorized federal/state/local law enforcement agencies, to obtain location information, including precision location information, cell site location information, and other signaling

information, including pen register information, in an effort to locate and monitor the location of the **subject cellular telephone.**

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the **subject cellular telephone** is currently being used in connection with violations of Title 21, United States Code, Sections 841(a)(1) and 846 (hereinafter referred to as "the subject offenses"), by a yet to be fully identified subject a.k.a. **"Coop"** and others known and unknown. There is also probable cause to believe that the location information described in Attachment B to the requested warrant and order will lead to evidence of the aforementioned subject offenses as well as to the identification of individuals who are engaged in the commission of those criminal offense and related crimes.

**BACKGROUND CONCERNING WIRELESS PROVIDERS**

6. Based on my knowledge, training, and experience, as well as information provided by investigators with specialized experience relating to cellular telephone technology, I am aware of the following facts and considerations:

a. Wireless phone providers typically generate and retain certain transactional information about the use of each telephone call, voicemail, and text message on their system. Such information can include log files and messaging logs showing all activity on a particular account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or other addressing information associated with particular telephone calls, voicemail messages, and text or multimedia messages.

b. Wireless phone providers also typically generate and retain information about the location in which a particular communication was transmitted or received. For example, when a cellular device is used to make or receive a call, text message or other communication, the wireless

phone provider will typically generate and maintain a record of which cell tower(s) was/were used to process that contact. Wireless providers maintain information, including the corresponding cell towers (i.e., tower covering specific geographic areas), sectors (i.e., faces of the towers), and other signaling data as part of their regularly conducted business activities. Typically, wireless providers maintain records of the cell tower information associated with the beginning and end of a call.

c. Because cellular devices generally attempt to communicate with the closest cell tower available, cell site location information from a wireless phone provider allows investigators to identify an approximate geographic location from which a communication with a particular cellular device originated or was received.

d. Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers.

e. Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscriber's full name and address, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscriber's Social Security Number and date of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscriber. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates and times of payments and the means and source of payment (including any credit card or bank account number).

f. Providers of cellular telephone service also typically have technical capabilities that allow them to collect and generate more precise location information than that provided by cell site location records. This information is sometimes referred to as E-911 phase II data, GPS data or latitude-longitude data. In the Eastern District of Missouri, such information is often referred to as precision location information or PLI data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by attempting to triangulate the device's signal using data from several of the provider's cell towers. Depending on the capabilities of the particular phone and provider, E-911 data can sometimes provide precise information related to the location of a cellular device.

g. In order to locate the **subject cellular telephone** and monitor the movements of the phone, the investigative agency(ies), and other authorized federal/state/local law enforcement agencies, may need to employ one or more techniques described in this affidavit and in the application of the United States. The investigative agency(ies), and other authorized

federal/state/local law enforcement agencies, may seek a warrant to compel the Provider, any telecommunication service providers reflected in Attachment A to the requested Warrant and Order, to include providers of any type of wire and/or electronic communications (herein incorporated by reference), and any other applicable service providers, to provide precision location information, including Global Position System information (if available), transactional records, including cell site location information, and pen register and trap and trace data.

**INVESTIGATION AND PROBABLE CAUSE**

7. The United States, including the DEA, is conducting a criminal investigation of "Coop" and others known and unknown regarding the commission of the subject offenses.

8. Upon information and belief, and as explained in greater detail below, the AT&T Wireless brand cellular telephone bearing number (314) 930-9624, hereinafter referred to as the "**subject cellular telephone"** (subscriber unknown), is believed to be utilized by "Coop" and his yet to be identified criminal associates in connection with the commission of the subject offenses.

9. During December 2023, your affiant along with other investigators from DEA St. Louis, Task Force Group 32, received information from a Confidential Source of Information, hereinafter referred to as "CD[1]", alleging he/she could purchase methamphetamine from Jeremy STORMER. Furthermore, CD told your affiant STORMER offered to take him/her directly to his (STORMER's) Source of Supply for methamphetamine. STORMER provided CD with his

[1] The Cooperating Defendant (CD) has prior arrests and convictions for unlawful use of a weapon, possession of up to 35 grams of marijuana, DWI, domestic assault 3rd Degree, burglary 2nd degree, failure to appear, possession of controlled substance felony, possession of a firearm, assault 1st degree, armed criminal action, distribution of controlled substance felony, probation violation, and resisting arrest. CD is providing information in an effort to receive judicial consideration in a pending federal investigation involving the distribution of methamphetamine and cocaine. CD has no history of providing false information to law enforcement. All information provided by CD to date has been independently corroborated by members of the investigative team. Investigators will continue to corroborate any and all information provided by CD before it is acted upon. In 2023, a United States Magistrate Judge authorized federal search warrants for locations used by CD to store and distribute controlled substances that included methamphetamine and cocaine.

cellular telephone phone number, 636-210-2294. Later in the investigation STORMER advised that his Source of Supply (SOS) for methamphetamine was a black male who went by the alias name of "Coop." STORMER provided CD with "Coop's" cellular telephone number, 314-250-8043, and investigators were able to utilize the provided cellular telephone number to conduct a controlled purchase with "Coop".

**Controlled Purchase on December 21, 2023**

10. On December 21, 2023, at the direction of your affiant, CD contacted STORMER via Facebook Messenger and arranged to purchase four ounces of methamphetamine in exchange for $500.00 from STORMER. STORMER agreed to allow CD to accompany him to pick up methamphetamine from his SOS and to allow CD to meet his (STORMER's) methamphetamine SOS, "Coop." Prior to departing for the meeting with STORMER, investigators searched CD for contraband. The search met with negative findings. CD was provided with $500.00 Official Advance Funds (OAF) to purchase methamphetamine from STORMER's source of supply. CD was equipped with a covert audio/video monitoring/recording device. STORMER directed CD to the parking lot of QuikTrip, 12110 Lusher Road, St. Louis, Missouri, 63138. CD departed the neutral location while being surveilled by members of the investigative team and traveled directly to QuikTrip. Moments later STORMER arrived and entered the passenger seat of CD's vehicle. CD and STORMER departed from the QuikTrip parking lot and traveled across the street to the Walgreens parking lot, 12098 Lusher Road, St. Louis, Missouri, 63138, where they remained until contacted by STORMER's SOS, "Coop". STORMER directed CD to 1900 Lakemont Lane, St. Louis, Missouri, 63138. Shortly after arriving at the meet location, "Coop" sold CD methamphetamine in exchange for the previously agreed upon amount. Immediately following the sale, CD drove STORMER back to QuikTrip where STORMER exited CD's vehicle and departed the area. CD drove directly to a neutral location and relinquished the purchased

methamphetamine to investigators. Investigators conducted a second search of CD for contraband. The search met with negative findings. CD returned the covert audio/video monitoring/recording device. Investigators field tested the purchased substance and the field test confirmed the presence of methamphetamine. The meeting between CD, STORMER, and "Coop" was audio and video recorded.

**Controlled Purchase on January 11, 2024**

11. On January 11, 2024, at the direction of your affiant, CD contacted STORMER via Facebook Messenger and by cellular telephone, to arrange the purchase of four ounces of methamphetamine in exchange for $600.00 from STORMER and STORMER's SOS "Coop". STORMER advised CD he would accompany CD to meet "Coop". Prior to departing for the meeting with STORMER, investigators searched CD for contraband. The search met with negative findings. CD was provided with $600.00 Official Advance Funds (OAF) to purchase methamphetamine from STORMER's SOS, "Coop". CD was equipped with a covert audio/video monitoring/recording device. STORMER directed CD to the parking lot of QuikTrip, 12110 Lusher Road, St. Louis, Missouri, 63138. CD departed the neutral location while being surveilled by members of the investigative team and traveled directly to QuikTrip. Moments later STORMER arrived and entered the passenger seat of CD's vehicle. STORMER was accompanied by his paramour, who entered the back-passenger seat of CD's vehicle. STORMER directed CD to 1920 Lakeheights Lane, St. Louis, Missouri, 63138. Shortly after arriving at the meet location, "Coop" sold CD methamphetamine in exchange for the previously agreed upon amount. Immediately following the sale, CD drove STORMER and STORMER'S paramour back to QuikTrip where STORMER and STORMER'S paramour exited CD's vehicle and departed the area. CD drove directly to the neutral location and relinquished the purchased methamphetamine to investigators. Investigators conducted a second search of CD for contraband. The search met with negative

findings. CD returned the covert audio/video monitoring/recording device. Investigators field tested the purchased substance and the field test confirmed the presence of methamphetamine. The meeting between CD, STORMER, STORMER'S paramour, and "Coop" was audio and video recorded.

**Controlled Purchase on January 25, 2024**

12. On January 25, 2024, at the direction of your affiant, CD contacted STORMER to arrange the purchase of four ounces of methamphetamine in exchange for $500.00 from STORMER's source of supply "Coop". STORMER provided CD with "Coop's" cellular telephone number, 314-250-8043. CD contacted "Coop" via text message communication at 314-250-8043 and arranged the purchase of four ounces of methamphetamine in exchange for $500.00 directly from "Coop". Prior to departing for the meeting with "Coop", investigators searched CD for contraband. The search met with negative findings. CD was provided with $500.00 Official Advance Funds (OAF) to purchase methamphetamine from "Coop". CD was equipped with a covert audio/video monitoring/recording device. CD advised "Coop" he/she would contact him ("Coop") once CD arrived at the parking lot of QuikTrip, 12110 Lusher Road, St. Louis, Missouri, 63138. CD departed the neutral location while being surveilled by members of the investigative team and traveled directly to QuikTrip. CD contacted "Coop" at 314-250-8043. "Coop" utilized 314-250-8043 to direct CD to 12808 Bright Oaks Court, Florissant, Missouri, 63033, where "Coop" sold CD methamphetamine in exchange for the previously agreed upon amount. Immediately following the sale, CD drove directly to the neutral location and relinquished the purchased methamphetamine to investigators. Investigators conducted a second search of CD for contraband. The search met with negative findings. CD returned the covert audio/video monitoring/recording device. Investigators field tested the purchased substance and the field test

confirmed the presence of methamphetamine. The meeting between CD and "Coop" was audio and video recorded.

13. As a result of investigation outlined above, on February 2, 2024, United States Magistrate Judge Joseph S. Dueker, Eastern District of Missouri, signed a warrant authorizing investigators to obtain location information, including precision location information (PLI); subscriber and transactional records; cell site information; and for a pen register and trap and trace devices for 314-250-8043 (4:24 MJ 2053 JSD).

14. On February 26, 2024, STORMER provided CD with "Coop's" new cellular telephone number, **(314) 930-9624**, **subject cellular telephone**, where investigators were able to utilize the provided cellular telephone number to conduct a controlled purchase with "Coop".

**<u>Controlled Purchase on February 27, 2024</u>**

15. On February 26, 2024, at the direction of your affiant, CD contacted STORMER to arrange the purchase of four ounces of methamphetamine in exchange for $500.00 from STORMER's source of supply "Coop". STORMER provided CD with "Coop's" cellular telephone number, **subject cellular telephone**. On February 27, 2024, CD contacted "Coop" via text message communication at **subject cellular telephone** and arranged the purchase of four ounces of methamphetamine in exchange for $500.00 directly from "Coop". Prior to departing for the meeting with "Coop", investigators searched CD for contraband. The search met with negative findings. CD was provided with $500.00 Official Advance Funds (OAF) to purchase methamphetamine from "Coop". CD was equipped with a covert audio/video monitoring/recording device. CD advised "Coop" he/she would contact him ("Coop") once CD arrived at the parking lot of QuikTrip, 12110 Lusher Road, St. Louis, Missouri, 63138. CD departed the neutral location while being surveilled by members of the investigative team and traveled directly to QuikTrip. CD contacted "Coop" at the **subject cellular telephone**. "Coop"

utilized **subject cellular telephone** to direct CD to the area of 1728 Bent Twig Lane, St. Louis, Missouri, 63138, where "Coop" sold CD methamphetamine in exchange for the previously agreed upon amount. Immediately following the sale, CD drove directly to the neutral location and relinquished the purchased methamphetamine to investigators. Investigators conducted a second search of CD for contraband. The search met with negative findings. CD returned the covert audio/video monitoring/recording device. Investigators field tested the purchased substance and the field test confirmed the presence of methamphetamine. The meeting between CD and "Coop" was audio and video recorded.

## CONCLUSION

16. Based on the above information, your affiant submits that there is probable cause to believe that the **subject cellular telephone** is currently being used in connection with the commission of the subject offenses, by "Coop" and others known and unknown. Specifically, the **subject cellular telephone** is being used by "Coop" to facilitate the distribution of controlled substances. The **subject cellular telephone** is the conduit between "Coop" and his customers to arrange for face-to-face meetings where the sale and distribution of controlled substances are discussed. There is also probable cause to believe that the location information described in Attachment B to the requested warrant and order will lead to evidence of the aforementioned subject offenses as well as to the identification of individuals who are engaged in the commission of those criminal offense and related crimes.

17. None of the investigative techniques that may be employed as a result of the present application and affidavit require a physical intrusion into a private space or a physical trespass. Electronic surveillance techniques such as pen register and cell site location monitoring typically have not been limited to daytime use only. Furthermore, the criminal conduct being investigated is not limited to the daytime. Therefore, the fact that the present application requests a warrant

based on probable cause should not limit the use of the requested investigative techniques to daytime use only. Accordingly, the investigative agency(ies), and other authorized federal/state/local law enforcement agencies, request the ability to employ these investigative techniques at any time, day or night.

18. The monitoring of the location of the **subject cellular telephone** by one of the methods described herein will begin within ten (10) days of the date of issuance of the requested Warrant and Order.

I state under penalty of perjury that the forgoing is true and correct

Jessica L. Davis
Task Force Officer
Drug Enforcement Administration

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 this 6th day of March, 2024.

JOSEPH S. DUEKER
UNITED STATES MAGISTRATE JUDGE
Eastern District of Missouri

**ATTACHMENT A**
4:24 MJ 2087 JSD

The United States has submitted an application pursuant to 18 U.S.C. §§ 2703(c)(1)(A) & B, (c)(2), and 3122 and Federal Rule of Criminal Procedure 41 requesting that the Court issue a Warrant and Order requiring a telecommunications service provider reflected in Part II of this Attachment A, to disclose the records and other information concerning the account described in Part I of this Attachment A.

**I. The Account(s)**

The Order applies to certain records and information associated with the following:

| **Provider Name** | **Number or identifier** | **Owner, if known** | **Subject of investigation, if known** |
|---|---|---|---|
| **AT&T** | **(314) 930-9624** (the subject cellular telephone) | | a yet to be fully identified subject a.k.a. **"Coop"** |

**II. The Provider**

Records and information associated with the subject cellular telephone that is within the possession, custody, or control of **AT&T,** and other applicable service providers reflected on the list contained in this Attachment A**,** including information about the location of the subject cellular telephone if it is subsequently assigned a different call number.

## LIST OF TELECOMMUNICATION SERVICE PROVIDERS

01 Communications
Access Line Communication
ACN, Inc.
ACS
Aero Communications, Inc. (IL)
Afford A Phone
Airvoice Wireless
Alaska Communications
Alhambra-Grantfx Telephone
Altice USA
AmeriTel
AOL Corp.
Arch Communication
AT&T
AT&T Mobility
Bell Aliant
Big River Telephone
Birch Telecom
Blackberry Corporation
Brivia Communications
Broadview Networks
Broadvox Ltd.
Budget Prepay
Bulls Eye Telecom
Call Wave
Cbeyond Inc.
CCPR Services
Cellco Partnership, d/b/a Verizon Wireless
Cellular One
Cellular South
Centennial Communications
CenturyLink
Charter Communications
Chickasaw Telephone
Choctaw Telephone Company
Cimco Comm
Cincinnati Bell
Cinergy Communications
Clear World Communication
Com-Cast Cable Comm.
Commercial Communications
Consolidated Communications
Cox Communications
Cricket Wireless
Custer Telephone Cooperative
DBS Communications
Delta Communications
Detroit Cellular
Dobson Cellular
Egyptian Telephone
Electric Lightwave, Inc.
Empire Paging
Ernest Communications
EZ Talk Communications
FDN Communications
Fibernit Comm
Florida Cell Service
Florida Digital Network
Focal Communications
Frontier Communications
FuzeBox, Inc.
Gabriel Comm
Galaxy Paging
Global Communications
Global Eyes Communications
Global Naps
Grafton Telephone Company
Grand River
Grande Comm
Great Plains Telephone
Harrisonville Telephone Co.
Heartland Communications
Hickory Telephone
Huxley Communications
iBasis
IDT Corporation
Illinois Valley Cellular
Insight Phone
Integra
Iowa Wireless
IQ Telecom
J2 Global Communications
Leap Wireless International
Level 3 Communications
Locus Communications
Logix Communications
Longlines Wireless
Los Angeles Cellular
Lunar Wireless
Madison River Communications
Madison/Macoupin Telephone Company
Mankato Citizens Telephone
Map Mobile Comm
Marathon Comm
Mark Twain Rural
Max-Tel Communications
Metro PCS
Metro Teleconnect
Mid-Atlantic
Midvale Telephone Exchange
Mobile Communications
Mound Bayou Telephone Co.
Mpower Communications
Navigator Telecommunications
NE Nebraska Telephone
Netlink Comm
Network Services
Neustar
Neutral Tandem
Nex-Tech Wireless
Nexus Communications
NII Comm
North Central Telephone
North State Comm
Northcoast Communications
Novacom
Ntera
NTS Communications
Oklahoma City SMSA
ONE Communications
ONSTAR
Optel Texas Telecom
Orion Electronics
PacBell
PacWest Telecom
PAETEC Communications
Page Plus Communications
Page Mart, Inc.
Page Net Paging
Panhandle Telephone
Peerless Network
Pineland Telephone
PhoneTech
PhoneTel
Preferred Telephone
Priority Communications
Puretalk
RCN Telecom
RNK Telecom
QWEST Communications
Sage Telecom
Seren Innovations
Shentel
Sigecom LLC
Sky Tel Paging
Smart Beep Paging
Smart City Telecom
Socket Telecom
Spectrum
Sprint
SRT Wireless
Star Telephone Company
Start Wireless
Sugar Land Telephone
Sure West Telephone Company
Talk America
Tele Touch Comm
Telecorp Comm
Telepak
Telispire PCS
Telnet Worldwide
Tex-Link Comm
Time Warner Cable
T-Mobile
Total Call International
Tracfone Wireless
Trinity International
U-Mobile
United Telephone of MO
United Wireless
US Cellular
US Communications
US LEC
US Link
US West Communications
USA Mobility
VarTec Telecommunications
Verisign
Verizon Telephone Company
Verizon Wireless
Viaero Wireless
Virgin Mobile
Vonage Holdings
Wabash Telephone
Wave2Wave Communications
Weblink Wireless
Western Wireless
Westlink Communications
WhatsApp
Windstream Communications
Wirefly
XFinity
XO Communications
Xspedius
Yakdin Valley Telephone
YMAX Communications
Ztel Communications [2]

[2] Last Update: 03/17/2019

# ATTACHMENT B

4:24 MJ 2087 JSD

It is hereby ordered, pursuant to 18 U.S.C. §§ 2703(c)(1)(A) &(B), (c)(2) and 3123 and Federal Rule of Criminal Procedure 41, that the Provider(s) identified in Attachment A shall disclose to the United States the following:

## I. PRECISION LOCATION INFORMATION

### A. Information to be Disclosed by the Provider

All information for the following time period of forty-five days from the date of this Warrant and Order, that is for the time period from ***March 6, 2024 to April 19, 2024***, 11:59 p.m. (CT) during all times of day and night, regarding the location of the subject cellular telephone described in Attachment A.

"Information about the location of the subject cellular telephone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precision location information, as well as all data about which "cell towers" (*i.e.*, antenna towers covering specific geographic areas) and "sectors" (*i.e.*, faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the investigative agency(ies).

### B. Information to Be Seized by the United States

All information described above in Part I, Section A that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846 involving a yet to be fully identified subject a.k.a. **"Coop"**.

## II. CELL TOWER RECORDS AND OTHER TELECOMMUNICATION DATA

For the subject cellular telephone identified in Attachment A, the following telecommunication records and information, but not the contents of any communication for the past thirty (30) days from the date of this Warrant and Order and at reasonable intervals for up to forty-five (45) days from the date of this Warrant and Order, the following:

**Information to be Disclosed by the Provider**

1. All available names, addresses, and identifying information, and other subscriber and service feature information and types of service utilized;

2. Length of service;

3. All telephone numbers, Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), or an International Mobile Station Equipment Identity ("IMEI") numbers, including any and all customer service records, credit and billing records, can-be-reached numbers (CBR), enhanced custom calling features, Media Access Control (MAC), and primary long-distance carrier;

4. Subscriber information available for any originating telephone number;

5. Automated Messaging Accounting (AMA) records (a carrier billing mechanism data base search which provides records of originating and terminating caller information for calls to the subject cellular telephone) for the above-specified time period;

6. Means and source of payment for services, including any credit card or bank account number, and air-time summaries for available service periods, for the IP (internet protocol) addresses being utilized by and signaled to and from the aforementioned subject cellular telephone;

7. Cellular telephone records and information pertaining to the following, for the above-specified time period:

(a) call detail information such as (provided in an electronic format specified by the agents/officers of the investigative agency(ies), and other authorized federal/state/local law enforcement agencies);

(b) cell site activation information, including information identifying the antenna tower receiving transmissions from the subject cellular telephone number, and any information on what portion of that tower is receiving a transmission from the subject cellular telephone number, at the beginning and end of a particular telephone call made to or received by the subject cellular telephone number;

(c) numbers dialed;

(d) call duration;

(e) incoming numbers if identified;

(f) signaling information pertaining to that number;

(g) a listing of all control channels and their corresponding cell sites;

(h) subscriber information, including the names, addresses, credit and billing information, published and non-published for the telephone numbers being dialed from the subject cellular telephone;

(i) historical location estimates and range to tower information, such as Network Event Location System (NELOS), round-trip time (RTT), GPS, and per-call measurement data (PCMD), True Call;

(j) Time Difference of Arrival (TDOA);

(k) Internet Protocol (IP addresses) utilized by and signaled to and from the subject cellular telephone**;** and,

(l) Data records to include all data connections between the device and the network via the subject cellular telephone.

## III. PEN REGISTERS AND TRAP AND TRACE DEVICES

For the subject cellular telephone identified in Attachment A for a period of forty-five (45) days from the date of this Warrant and Order, the following:

1. Pursuant to Title 18, United States Code, Section 3123, pen register and trap and trace devices, including enhanced caller identification, may be installed by the investigative agency(ies) and used to record or decode dialing, routing, addressing, or signaling information, and to capture the incoming electronic or other impulses, which identify the originating number or other dialing, routing, addressing and signaling information reasonably likely to identify the source of a wire or electronic communication to and from the subject cellular telephone number, including the direct connect, Voice-over-LTE (VoLTE), non-content data transmissions, or digital dispatch dialings (if applicable), the dates and times of such dialings, and the length of time of the connections, pertaining to the subject cellular telephone described in Attachment A., including the date, time, and duration of the communication, and the following, without geographic limit, including:

a. IP addresses associated with the cell phone device or devices used to send or receive electronic communications;
b. Any unique identifiers associated with the cell phone device or devices used to make and receive calls with cell phone number described in Attachment A, or to

send or receive other electronic communications, including the ESN, MEIN, IMSI, IMEI, SIM, MSISDN, or MIN;

c. IP addresses of any websites or other servers to which the subject cellular telephone connected;

d. Source and destination telephone numbers and email addresses;

e. "Post-cut-through dialed digits," which are digits dialed after the initial call set up is completed, subject to the limitations of 18 U.S.C. § 3121(c).

2. The Provider, and/or any telecommunications service providers reflected in Attachment A, to include providers of any type of wire and/or electronic communications, and any other applicable service providers, shall initiate caller identification on the subject cellular telephone identified in Attachment A, without the knowledge of or notification to the subscriber, for the purpose of registering incoming telephone numbers

3. The Providers reflected in Attachment A, to include providers of any type of wire and/or electronic communications, and any other applicable service providers, shall furnish the agents/officers of the investigative agency(ies), and other authorized federal/state/local law enforcement agencies, forthwith all information, facilities, and technical assistance necessary to accomplish the installation and use of the pen register and trap and trace devices, including enhanced caller identification, unobtrusively and with minimum interference to the services that are accorded persons with respect to whom the installation and use is to take place.

4. The Providers reflected in Attachment A, to include providers of any type of wire and/or electronic communications, and any other applicable telecommunications service providers, shall provide the agents/officers of the investigative agency(ies), and other authorized federal/state/local law enforcement agencies, with the results of the pen register and trap and trace

devices, including enhanced caller identification, at reasonable intervals for the duration of this Warrant and Order.

5. Should the subject cellular telephone identified in Attachment A and/or ESN, MIN, IMEI, MSID or IMSI number listed above be changed by the subscriber during the effective period of this Order, the request for pen register and trap and trace devices, including enhanced caller identification, shall remain in effect for any new telephone to which the subject cellular telephone listed above is changed throughout the effective period of these Warrants and Orders.

6. The Providers reflected in Attachment A, to include providers of any type of wire and/or electronic communications, and any other applicable service providers, shall be provided compensation by the lead investigative agency for reasonable expenses incurred in providing technical assistance.

7. Pursuant to Title 18, United States Code, Sections 3123(d)(1) and (2), the Provider, and the service providers reflected in Attachment A, to include providers of any type of wire and/or electronic communications, and any other applicable service providers, shall not disclose the existence of this application and/or any warrant or order issued upon this application, or the existence of the investigation, for a period of one year from the date of this Order to a subscriber or lessee or to any other person, except that the provider may disclose the warrant to an attorney for the provider for the purpose of receiving legal advice.

This Warrant and Order does not authorize interception of any communications as defined in Title 18, United States Code, Section 2510(4), but authorizes only the disclosure of signaling information, including cell site information, precision location information, including GPS information, related to the subject cellular telephone.

The investigative agency(ies), and other authorized federal/state/local law enforcement agencies, to whom this Warrant and Order is directed will begin monitoring the location of the subject cellular telephone by one of the methods described in this Warrant within ten (10) days of the date of this Warrant and Order.